\#

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SPENCER RANDALL,<br><br>    Plaintiff,<br><br>    v.<br><br>MAS MEDICAL STAFFING CORPORATION,<br><br>    Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Spencer Randall ("Randall"), by and through undersigned counsel, and complains against the Defendant, MAS Medical Staffing Corporation ("MAS"), as follows:

INTRODUCTION

1.  MAS failed and refused to hire Randall due to his disability (Post-Traumatic Stress Disorder, or PTSD) and his request and need for a reasonable accommodation (a service dog).

2.  This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. §§ 701 *et seq.*

3.  When Congress passed the Rehab Act in 1973, it found that millions of Americans have one or more physical or mental disabilities and the number of Americans with such disabilities is increasing; that individuals with disabilities constitute one of the most

disadvantaged groups in society; that disability in no way diminishes the right of individuals to pursue meaningful careers; and that the goals of the Nation properly include achieving equality of employment opportunity for such individuals. 29 U.S.C. §701.

4. Seventeen years later, when Congress passed the ADA in 1990, it found that historically, society has tended to isolate and segregate individuals with disabilities and that despite some improvements, discrimination in employment against individuals with disabilities continued to be a serious and pervasive social problem due to outright intentional exclusion, the discriminatory effects of overprotective rules and policies, and the failure to make modifications to existing facilities and practices among other things. Congress repeated that the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, and economic self-sufficiency for such individuals. 42 U.S.C. §§ 12101(a).

5. The MHRA declares as the policy of the State of Maine that every individual has the civil right to secure employment without discrimination based on, among other things, physical or mental disability. 5 M.R.S. §4571.

## PARTIES

6. Randall is a United States citizen residing in Ellsworth, Maine.

7. MAS is a New Hampshire corporation that has offices in several locations including Bangor, Maine.

## JURISDICTION

8. MAS had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

9. At all relevant times, MAS was a recipient of federal financial assistance in the form of Mainecare and Medicaid reimbursement.

10. This Court has subject matter jurisdiction over Randall's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

11. Randall filed a timely Charge of Discrimination against MAS alleging unlawful disability discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

12. On or about February 2, 2018, the MHRC issued a Notice of Right to Sue with respect to Randall's MHRA claims.

13. On or about February 2, 2018, the EEOC issued a Notice of Right to Sue with respect to Randall's ADA claims.

14. Randall has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL REQUESTED

15. Randall requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

16. Randall served in the U.S. Army from October 2007 to January 2009. At the time he was discharged, his rank was Private First Class (E3).

17. About a year or two after Randall was medically discharged from the Army, Randall was diagnosed with PTSD as part of his service-connected disability.

18. In 2013, Randall began training and then using a service dog to help him cope with PTSD.

19. Randall's service dog, Sammy, is a yellow Labrador retriever mix.

20. Sammy helps Randall control symptoms of his PTSD.

21. For example, it is uncomfortable for Randall to have people behind his back so Sammy is trained to put space between Randall and other people. If Randall is standing in line at a store, Sammy lies behind him to create space. Sammy is also trained to distract Randall when his anxiety is elevated by nudging Randall's hand to make him give pets. Sammy is also trained to wake Randall up when he has night terrors.

22. Randall has worked at a variety of jobs from January 2009 when he was discharged from the Army to the present.

23. Among other things, Randall was employed by two different agencies as a Direct Support Professional (DSP), working in group home settings. Both agencies granted Randall the reasonable accommodation of letting Sammy accompany Randall at work. There were no problems or concerns raised about Sammy's presence in the group homes or about his interactions with clients. In fact, the clients enjoyed Sammy and seemed to benefit from having Sammy around.

24. In April 2017, MAS advertised to fill per diem DSP/CRMA positions working in residential group homes throughout the state.

25. Every MAS employee is hired with per diem status. The number of hours an employee works, full or part time, is up to the employee. Thirty-two to 40 hours per week is considered full time. MAS offers medical and dental benefits to full time employees.

26. On Tuesday, April 4, 2017, Randall applied for a job and was interviewed by Kate Cropley, HR Assistant for MAS. The job that they discussed was a staffing position at a Bangor-area residential care facility.

27. Cropley told Randall that the starting pay was $15.50 to $16.50 per hour depending on his qualifications and experience.

28. Cropley asked Randall about his prior employment and about his skills and experience working with the client-base served by MAS.

29. Cropley asked Randall about his DSP and CRMA training and certifications. Randall told Ms. Cropley that he had been DSP certified for three years and that he had a 24-hour CRMA license but was willing to take additional training for a 40-hour CRMA license. Cropley told Randall that while he was taking the CRMA course for the DSP/CRMA job, he could work as a Daily Living Support (DLS) provider in the homes of adult clients who do not need help taking their medications.

30. Sammy accompanied Randall to the interview wearing a vest that identifies him as a PTSD service dog.

31. Cropley appeared to be comfortable having Sammy at the interview and did not ask questions about Randall's disability or about what service Sammy provides for Randall.

32. Toward the end of the interview, Randall asked Cropley if he could bring his service dog to work with him. Cropley told Randall that she needed to check into this and would let him know one way or the other.

33. On Tuesday, April 11, 2017, Cropley sent an email to Randall declining to hire him for the job of DSP/CRMA because he uses a service animal.  She wrote:

> "Hi Spencer-
>
> "Thank you for meeting with me last week to discuss the DSP/CRMA staffing role. After speaking with our staffing coordinator in Bangor regarding your PTSD service dog, she reached out to our Staffing Director in Westbrook to determine whether your dog could accompany you to various group homes. Unfortunately, at this time group homes will not allow a service dog to be on shift due to potential allergies, sensitivities, reactions, etc. that group home residents may have to a dog being present.
>
> "Please let me know if you have questions. It was a pleasure meeting you, and your service dog, and I wish you all the best in your job search.

> "Thank you"

34. Randall responded by email with a question:

> "Was the service dog the only thing holding me from a position with MAS community health?"

35. Copley confirmed that Randall was an excellent candidate and that the only reason he was not hired was because of his service dog. She wrote, "Hi Spencer, Yes," meaning, "Yes, the only thing holding you from a position with MAS is your service dog."

36. Copley went on to explain that Randall was otherwise qualified and would have been hired even though he had a 24-hour CRMA license and not a 40-hour license:

> "We contract out to group homes and are beholden to their rules and regs so that's the only reason we couldn't staff you. We do require a 40 hour CRMA course for group home staffing and yours is 24 hour, but that's not an obstacle to hire. You would have the option of doing DLS hours with our Adult services division while you worked towards your 40 hour CRMA, then we could staff you both as DSP and DLS with Adult Services."

37. In her email, Copley said the same thing about Randall working as a DLS provider as she said during his interview, that is, that he could work as a DLS provider while he was upgrading his CRMA license.

38. Copley was not offering to hire and was not considering to hire Randall as a DLS provider. If she was, she would have said something about that in her first email on April 11, 2017. In her second email, she would have told Randall the next steps he needed to take to become employed as a DLS provider for MAS.

39. Randall has an actual disability as defined by the MHRA, ADA and the Rehab Act. Randall was also regarded as disabled, and has a record of disability.

40. EEOC Regulations, 29 CFR § 1630.2(j)(3)(iii), state that an individualized assessment of virtually all people with PTSD will result in a determination of disability under the

ADA. Given its inherent nature, PTSD will almost always be found to substantially limit the major life activity of brain function.

41. Randall's PTSD significantly impairs health as defined by the MHRA when viewed without mitigating measures.

42. Randall's PTSD substantially limits major life activities when viewed without mitigating measures.

43. Randall is a qualified individual with a disability as defined by the MHRA, ADA and the Rehab Act.

44. Randall has the skills and experience for the job of DSP/CRMA with MAS with the exception of a 40-hour CRMA license. However, MAS told Randall that the lack of a 40-hour license was not an obstacle to him being hired.

45. MAS has a *de facto* policy banning animals from the workplace.

46. Randall requested the reasonable accommodation of bringing his service dog, Sammy, to work with him.

47. Randall's request to use his service dog at work was a request for MAS to modify its no-animal policy to accommodate Randall's disability.

48. On the face of things, it was feasible for MAS to grant Randall's request. In Randall's experience, bringing Sammy to work with him at group homes is both necessary for him and a positive experience for the people he works with and for.

49. MAS had a legal obligation to consider modifying its no-animal policy on a case by case basis.

50. MAS had a legal obligation to grant Randall's request unless doing so would have resulted in an undue hardship.

51. Here, MAS did not conduct an individualized assessment of Randall's accommodation request.

52. The process followed by MAS in this case consisted of the following (paragraphs 53 to 57 below).

53. Copley, the HR Specialist who received the accommodation request, passed the request along to Sarah McNeal, a MAS Scheduling Coordinator.

54. McNeal was unsure of the answer and passed the request along to Tracy Burnham, MAS Medical Staffing/Marketing Director.

55. Burnham denied the request based on an alleged previous conversation with "group homes" regarding service animals for DSP/CRMAs.

56. Burnham claims she had been told, in the past, that homes could not accept service animals because of (a) resident allergies and (b) issues related to liability.

57. Burnham communicated the denial to McNeal who communicated the denial to Copley who communicated the denial to Randall.

58. MAS did not conduct an individualized assessment by contacting the group homes where Randall would be working to inquire if they had a policy prohibiting service animals and/or whether they could make an exception to a policy as an accommodation.

59. Instead, MAS denied Randall employment because it had allegedly denied similar accommodations in the past.

60. MAS had no knowledge that anyone in a group home where Randall would be working had an allergy to dogs, or was afraid of dogs, or that having a dog come to work would pose any problem at all.

61. If someone did have an allergy to dogs or was afraid of dogs, MAS had an obligation to explore whether the person with allergies and/or fear could be accommodated along with Spencer's disability-related need for a service dog.

62. MAS refused to hire Randall because of disability discrimination.

63. MAS refused to hire Randall because he requested a reasonable accommodation.

64. MAS refused to hire Randall in retaliation for him engaging in protected activity by requesting a reasonable accommodation.

65. MAS's refusal to modify its no-dog policy was an artificial, arbitrary, and unnecessary barrier to employment for Randall.

66. MAS failed to make reasonable accommodations to Randall's known mental limitations and cannot demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity.

67. MAS denied an employment opportunity to Randall based on MAS's need to make reasonable accommodation to Randall's physical impairment.

68. MAS acted unlawfully by participating in a contractual relationship that had the effect of subjecting Randall to disability discrimination.

69. MAS acted intentionally and with deliberate indifference to Randall's rights.

70. MAS's actions were done solely because of disability.

71. Randall's disability and/or his request for a reasonable accommodation were a motivating factor in MAS's failure to hire Randall.

## COUNT I: MHRA – DISABILTY DISCRIMINATION

72. Paragraphs 1-71 are incorporated by reference.

73. MAS's conduct violates the MHRA's prohibitions against disability discrimination.

### COUNT II: MHRA – FAILURE TO PROVIDE REASONABLE ACCOMMODATION

74. Paragraphs 1-73 are incorporated by reference.

75. MAS's conduct violates the MHRA's requirement that employers provide reasonable accommodations for qualified individuals with disabilities.

### COUNT III: MHRA - RETALIATION

76. Paragraphs 1-75 are incorporated by reference.

77. MAS's conduct violates the MHRA's prohibitions against retaliation.

### COUNT IV: ADA – DISABILTY DISCRIMINATION

78. Paragraphs 1-77 are incorporated by reference.

79. MAS's conduct violates the ADA's prohibitions against disability discrimination.

### COUNT V: ADA – FAILURE TO PROVIDE REASONABLE ACCOMMODATION

80. Paragraphs 1-79 are incorporated by reference.

81. MAS's conduct violates the ADAs requirement that employers provide reasonable accommodations for qualified individuals with disabilities.

### COUNT VI: ADA - RETALIATION

82. Paragraphs 1-81 are incorporated by reference.

83. MAS's conduct violates the ADA's prohibitions against retaliation.

### COUNT VII: REHAB ACT – DISABILTY DISCRIMINATION

84. Paragraphs 1-83 are incorporated by reference.

85. MAS's conduct violates the Rehab Act's prohibitions against disability discrimination.

## COUNT VIII: REHAB ACT – FAILURE TO PROVIDE REASONABLE ACCOMMODATION

86. Paragraphs 1-85 are incorporated by reference.

87. MAS's conduct violates the Rehab Act's requirement that employers provide reasonable accommodations for qualified individuals with disabilities.

## COUNT IX: REHAB ACT - RETALIATION

88. Paragraphs 1-86 are incorporated by reference.

89. MAS's conduct violates the Rehab Act's prohibitions against retaliation.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to hire Plaintiff or award front pay to Plaintiff;

D. Require that Defendant place a document in Plaintiff's personnel file after he is hired which explains that Defendant unlawfully refused to hire him because of disability;

E. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

F. Award equitable-relief for back pay, benefits and prejudgment interest;

G. Award compensatory damages in an amount to be determined at trial;

H. Award punitive damages in an amount to be determined at trial;

I. Award nominal damages;

J. Award attorney's fees, including legal expenses, and costs;

K. Award prejudgment interest;

      L.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

      M.      Permanently enjoin Defendant from participating in contractual relationships that have the effect of subjecting qualified individuals with disabilities to disability discrimination;

      N.      Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

      O.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

      P.      Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA and the Rehab Act; and

      Q.      Grant to Plaintiff such other and further relief as may be just and proper.

Dated:  February 24, 2018                      /s/ Chad T. Hansen
                                                  chansen@maineemployeerights.com

                                                  Attorney for the Plaintiff

                                                  MAINE EMPLOYEE RIGHTS GROUP
                                                  92 Exchange Street 2nd floor
                                                  Portland, Maine 04101
                                                  Tel. (207) 874-0905
                                                  Fax (207) 874-0343